*335 OPINION OF THE COURT
Joseph D. Mintz, J.
Plaintiffs St. Joseph Hospital of Cheektowaga and Catholic Health System, Inc. (hereinafter CHS) commenced this action for declaratory judgment and injunctive relief under CPLR 3001, and injunctive relief under 42 USC § 1983. They seek to prevent the implementation of recommendations made by defendant New York State Commission on Health Care Facilities in the 21st Century as pertain to the recommended closing of the hospital. Plaintiffs move for summary judgment on all causes of action, and defendants cross-move for summary judgment dismissing the complaint in its entirety.
The amended complaint asserts 16 separate causes of action. Most of the causes of action (including the first, second, fourth, fifth, seventh, eighth, tenth, eleventh, fourteenth causes of action) seek a declaration that section 31 of part E of chapter 63 of the Laws of 2005, adding part K (hereinafter the Enabling Act) is unconstitutional under various provisions of the New York and United States constitutions. Several causes of action (including the third, sixth, ninth, twelfth, fifteenth causes of action) seek injunctive relief preventing the defendant New York State Health Commissioner from implementing the determinations of the defendant Commission on Health Care Facilities in the 21st Century as required under the Enabling Act, in that such implementation would constitute an abridgment of plaintiffs’ constitutional rights under the color of state law, as prohibited by 42 USC § 1983. The thirteenth cause of action seeks a declaration that the Enabling Act is unenforceable as it is violative of the New York State Administrative Procedure Act and the sixteenth cause of action seeks a declaration that the agreement between defendant George E. Pataki, as Governor of the State of New York, and the Centers for Medicare and Medicaid Services is unconstitutional under the New York State Constitution.
I. The Enabling Act
In 2005, the Legislature determined that a review of health care capacity and resources was necessary in order to promote stability and efficiency in the health care delivery system infrastructure. At that time, the Commissioner of Health had broad powers over health care providers through the control of the providers’ operating licenses. For example, under Public Health Law § 2806 (6) (a), the Commissioner may “suspend, *336 limit, modify, or revoke a hospital operating certificate, after taking into consideration the total number of beds necessary to meet the public need.” Nonetheless, the Legislature determined that it would be within the best interests of the state if the review of the health care capacity and resources were conducted by a commission “separate and apart from existing bodies responsible for the establishment and continued oversight of general hospitals and nursing homes.”[1] As a result, the Legislature created a temporary commission charged with this review.
Section 2 of the Enabling Act specifies the creation within the executive department of the Commission, its membership and the method of appointment of its members. Subdivision (c) requires the commission to adopt bylaws for the management and regulation of its work. Sections 3 and 4 concern appointment of members and the Commission staff. Section 5 sets forth the factors that the Commission must consider in its deliberations. Section 6 concerns the method of meetings, deliberations and proceedings by the Commission. Section 7 provides for the creation of regional members and advisory committees for each of six regions. It also directs the advisory committee to develop recommendations and specifies considerations in reaching those recommendations. Finally, it directs each regional advisory committee to transmit a report containing its recommendations to the Commission by November 15, 2006, including specific recommendations for which facilities should be closed, resized, consolidated, converted or restructured, with a timetable and any necessary provisions of funds, human capital or training in order to accomplish it. The recommendations must have been accompanied by the advisory committee’s justification for the recommendations, including which of the statutorily required factors were considered. Section 8 provides for the development of recommendations by the Commission, itself, similar to those provisions contained in section 7 pertinent to regional advisory committees. The Commission’s recommendations, pursuant to section 8 (c), were to be transmitted to the Governor and the Legislature by December 1, 2006. Section 9 provides for the implementation of the Commission’s recommendations by the Health Commissioner, notwithstanding any contrary provision *337 of law (including Public Health Law § 2806), unless the Governor chooses not to transmit the Commission’s report with approval of the recommendations, or unless a majority of the members of each house of the Legislature vote to adopt a concurrent resolution rejecting the Commission’s report in its entirety, by December 31, 2006.
Section 10 is a severability clause, which reads in its entirety:
“If any clause, sentence, paragraph, subdivision, section or part of this act shall be adjudged by any court of competent jurisdiction to be invalid, such judgment shall not affect, impair, or invalidate the remainder thereof, but shall be confined in its operation to the clause, sentence, paragraph, subdivision, section or part thereof directly involved in the controversy in which such judgment shall have been rendered. It is hereby declared to be the intent of the legislature that this act would have been enacted even if such invalid provisions had not been included herein.”
The Commission rendered its report on November 28, 2006. The Governor transmitted it to the Legislature with his approval on December 5, 2006. The Legislature did not adopt any resolution rejecting the Commission’s report. As a result, under the terms of the Enabling Act, the Health Commissioner is required to implement the recommendations of the report, pursuant to section 9 (a).
II. Plaintiffs’ Claims Under the Presentment Clause and Separation of Powers Clause of the New York State Constitution
Plaintiffs’ first cause of action claims that the provision of section 9 of the Enabling Act which requires the Health Commissioner to implement the recommendations of the Commission unless the Legislature adopts a concurrent resolution rejecting the report in its entirety constitutes a legislative veto. As such, since it does not provide for the enactment of legislation with presentment to the Governor, plaintiffs claim it violates the Presentment Clause of article iy § 7 of the New York State Constitution. In the second cause of action, plaintiffs claim that section 9’s provision of a transmittal by the Governor followed by the possibility of a legislative veto is contrary to the Separation of Powers Clause in article iy § 7 of the New York State Constitution. Defendants claim that there is no constitu *338 tional infirmity, but also claim that due to the severability provision in section 10, the constitutionality of the legislative veto, since unexercised, is moot and that the plaintiffs are without standing to raise the issue of its constitutionality.
A. Severability
While defendants do not concede that the legislative veto is unconstitutional, they claim that, even if it is, the remainder of the Enabling Act may be enforced in its absence. Whether or not an offending provision may be severed from the remainder of the statute requires an examination of both legislative intent regarding the severability and whether the remaining provisions of the statute can function in accordance with the legislative scheme. (People ex rel. Alpha Portland Cement Co. v Knapp, 230 NY 48 [1920]; Matter of Westinghouse Elec. Corp. v Tully, 63 NY2d 191 [1984].) While a comprehensive severability clause may give evidence of the legislative intent regarding severability, a provision will not be severed if the remaining provisions pervert the Legislature’s intent in the enactment of the statute. (CWM Chem. Servs., L.L.C. v Roth, 6 NY3d 410 [2006].)
A legislative veto, by its nature, is separate from the substantive provisions of a statute. The activity under the legislation occurs so long as the Legislature refrains from its exercise. This makes the operation of the statute independent from the legislative veto, and assures that the remainder of the statute can function in the absence of the veto. There remains, however, the requirement that the court inquire into whether it would have been the intent of the Legislature to allow the operation of the statute in the absence of the veto by examining both whether the Legislature evidenced intent of severability and also whether the remaining provisions will function in a manner consistent with the Legislature’s intent. (Alaska Airlines, Inc. v Brock, 480 US 678 [1987].)
On the first question, the language of section 10 of the Enabling Act makes clear that the Legislature contemplated the severance of any offending portion of the act. This produces a strong presumption that the Legislature intended the legislative veto provision to be severable. Also, because the legislative veto was to be the last of the procedural rules concerning the report, and does not impact on the substantive portions of the legislation, it is even more likely that the Legislature intended it to be severable.
On the second question, the delegation of legislative powers to an administrative entity within the executive branch without *339 a reservation of veto power in the Legislature would entail a shift in the balance of power between the legislative and executive branches. It is proper to consider whether the delegation of power is so controversial or so broad that the Legislature would have been unwilling to make the delegation without an oversight mechanism. (Alaska Airlines, 480 US at 685.)
The Health Commissioner already has broad powers under Public Health Law § 2806 (6) to effect hospital operating certificates without oversight by the Legislature. While the Commission was charged under the Enabling Act with a comprehensive review of all of the hospitals and nursing homes in the state, the actual power given to the Commission was no greater than the power already vested in the Health Commissioner. The delegation of power under the Enabling Act was neither so controversial nor so broad to conclude that the Legislature would not have been willing to make the delegation without the legislative veto.
In support of their claim that the legislative veto was unseverable, plaintiffs attempt to show that it was essential to the legislation by the affidavit of Paul A. Tokasz, who was majority leader of the Assembly at the time of the passage of the Enabling Act. In the affidavit he stated that he would not have voted for the Enabling Act without the legislative veto, and that in his opinion the Enabling Act would not have been enacted without it. This affidavit, as a postenactment statement of an individual legislator, aside from its limited probative value, is not admissible except in extraordinary circumstances to demonstrate the existence of a discriminatory purpose or motivation. (Civil Serv. Empls. Assn. v County of Oneida, 78 AD2d 1004 [4th Dept 1980].)
Based upon the severance clause in section 10, the legislative purposes, the existing powers of the Health Commissioner and the functionability of the Enabling Act in the absence of the legislative veto, the provision is severable from the remainder of the statute, and even if unconstitutional, will not nullify the remainder of the Enabling Act.
B. Mootness of the Question of Constitutionality of the Legislative Veto and Plaintiffs’ Lack of Standing
The legislative veto did not occur. By December 31, 2006, the Legislature had not passed concurrent resolutions seeking the rejection of the Commission’s report. Plaintiffs seek to prevent the implementation of the Commission’s report, which imple *340 mentation would not have occurred had the Legislature exercised the legislative veto. Plaintiffs are not aggrieved by the legislative veto, but only by the Enabling Act as a whole, and by the actions of the Commission and the Commissioner thereunder. Since the legislative veto is severable from the remainder of the act, and the veto was not exercised, plaintiffs have no standing to challenge its constitutionality. (Society of Plastics Indus. v County of Suffolk, 77 NY2d 761 [1991].) As a result, the constitutionality of the legislative veto need not be addressed.
For the foregoing reasons, the plaintiffs’ first and second causes of action are dismissed.
III. Plaintiffs’ Claims under the Due Process Clauses of the United States and New York Constitutions
In the fourth, fifth, and seventh causes of action, plaintiffs claim that the Enabling Act violates their rights to procedural and substantive due process under the Fourteenth Amendment to the United States Constitution and under article I, § 6 of the New York State Constitution. In the third and sixth causes of action, plaintiffs also seek injunctive relief against the Health Commissioner under 42 USC § 1983 to prevent the implementation of the Commission’s recommendations, in that they claim that such implementation would deprive them of rights to due process secured by the Constitution.
Defendants claim that plaintiffs have no protected property rights in their hospital operating certificate and that the Enabling Act does not violate procedural or substantive due process.
A. Plaintiffs’ Property Rights in the Operating Certificate
Any claim under the Due Process Clause of the United States Constitution or under the New York Constitution is predicated upon a finding that the aggrieved party has a protected liberty or property interest. Under either Constitution, the determination as to whether there is a protected right is made under state law. (Cleveland Bd. of Ed. v Loudermill, 470 US 532 [1985].) As a manifestation of its entitlement under state law, plaintiffs claim that the procedure established under Public Health Law § 2806 (2) establishes a property right in its operating license. While section 2806 (2) requires a hearing prior to the revocation, modification or other effect to the operating license, the provision of these procedural safeguards alone does not constitute a finding of a property right. Furthermore, under section *341 2806 (6), it is clear that the Health Commissioner may affect the operating license for the public good without the hearing required by section 2806 (2). Thus, the language of the statute itself does not definitively confirm that the plaintiffs have a property interest in their hospital operating certificate.
In addition, plaintiffs point to a myriad of cases where the courts have found property interests in various licenses, including professional licenses (see, e.g., O’Brien v O’Brien, 66 NY2d 576 [1985] [concerning a medical license]) and operating licenses (see, e.g., Honey Dippers Septic Tank Servs. v Landi, 198 AD2d 402 [2d Dept 1993] [concerning a waste disposal license]), as well as other certifications (see. e.g. Chrisley v Morin, 126 AD2d 977 [4th Dept 1987] [concerning minority business enterprise certification]).
Defendants acknowledge that most licenses constitute property interests, but assert that where the State has retained “significant discretionary authority over the bestowal or continuation of a government benefit” there is no property interest in that benefit. (Plaza Health Labs., Inc. v Perales, 878 F2d 577, 581 [2d Cir 1989].) Defendants claim that Public Health Law § 2806 (6) constitutes the retention of significant discretionary authority negating any property interest in a hospital operating certificate. In support of this claim, defendants cite numerous cases which demonstrate that when the State has retained the right to terminate a license without cause, there is no property right.
While section 2806 (6) does constitute significant discretionary authority, it is clear by the legislative history to 1978 amendments[2] to section 2806 that the Legislature did not intend such discretionary authority to negate property interests in a hospital operating license. At the time of the 1978 amendments, section 2806 (6) was in its current form. Yet the Legislature acknowledged that patients’ rights were to be protected “while taking due consideration of the due process and property rights of the operators of such facilities” (L 1978, ch 713, § 1). Thus, it was not intended by the Legislature that section 2806 (6) constitute the type of substantial discretion to negate the existence of property rights. Given that plaintiffs’ livelihood depends on the operating certificate and the acknowledgment by the courts of the property interests in like licenses and certifications, it is in *342 escapable that the plaintiffs did have a protected property interest in their operating certificate at the time of the enactment of the Enabling Act.
Defendants claim that any property interest afforded through section 2806 is trumped by the Enabling Act. This argument is better addressed to whether the Enabling Act afforded substantive and procedural due process, not as to whether the plaintiffs had a property interest. If the plaintiffs’ property interest was terminated by the enactment of the Enabling Act, then it is imperative that such legislation afford the plaintiffs constitutional protection under the Due Process clauses.
B. Substantive Due Process
Recognizing that the plaintiffs have a property interest in the hospital operating license, substantive due process requires that any termination of that property interest be rationally related to a legitimate state interest. (Bower Assoc. v Town of Pleasant Val., 2 NY3d 617 [2004].) Unless there is a showing of both a property right and that the actions of the State or municipality were made “wholly without legal justification,” claims under substantive due process cannot lie. (Bower, supra at 627.) Where the State acts under its police power for the welfare of its citizens, those actions do not constitute a violation of any substantive due process rights.
The legislative findings contained in section 1 of the Enabling Act demonstrate that the actions of the State in enacting the Enabling Act were in furtherance of its police power by evaluating the State’s health care system and by aligning health care resources in a stable and efficient manner. In contrast to Town of Orangetown v Magee (88 NY2d 41 [1996]), this was not a decision motivated by politics. In fact, the structure of this legislation makes clear that the Legislature wanted to minimize the political aspects of any decision. Under Magee and Bower, there is no violation of substantive due process rights. For these reasons, plaintiffs’ sixth and seventh causes of action are dismissed.
C. Procedural Due Process
The Due Process clauses of the United States and New York constitutions require that, when the government affects property rights, the aggrieved party be afforded notice and an opportunity to be heard. Plaintiffs claim that the Enabling Act does not afford sufficient notice and any meaningful opportunity *343 to be heard prior to the termination of its hospital operating certificate.
Defendants claim that when property rights in licenses are affected by legislation, as long as the Legislature has followed its proper procedures and if the legislation is in furtherance of the State’s police power (see III. B., above), that is all the due process necessary.
Defendants’ position is correct when the legislation is affecting property rights of all holders of those property rights. When the Legislature passes legislation which reduces government benefits or entitlements in which individuals may have property rights, no other procedural due process is necessary. (Atkins v Parker, 472 US 115 [1985].) In contrast, however, when the Legislature creates an administrative body to determine hospital closings and reorganizations, which affect the hospitals’ property rights, such legislation does not necessarily constitute due process. First, there must be a determination whether the Legislature has delegated its legislative function (i.e„, giving the administrative body rule-making authority) or whether the Legislature has empowered the administrative body with an adjudicative function. If the latter, the delegation to the administrative body must ensure that the administrative body will make its decisions in a manner consistent with the affected parties’ due process rights. At a minimum, the parties to be affected are entitled to notice and an opportunity to be heard.
The delegation to the Commission was not a legislative function. The Commission was not called upon to enact rules, but instead, to recommend which hospitals were to be closed and which hospitals would have to close or merge certain departments. In determining whether a delegation is legislative or adjudicative, the function of the administrative body is examined. If that function involves fact-finding regarding the activities, business and property of the parties to be affected, the function is adjudicative. (RR Vil. Assn., Inc. v Denver Sewer Corp., 826 F2d 1197 [2d Cir 1987].)
In determining whether the adjudicative function of the administrative body affords procedural due process, there is no specific measure of what procedural requirements meet the minimum requirement of notice and an opportunity to be heard. There is no question that the plaintiffs received notice of the deliberations of the Commission and an opportunity to submit written material. Every hospital was on notice that the Commission might recommend its closing or consolidation. It is un *344 reasonable to expect that as the Commission deliberated and certain hospitals became more likely to be affected that some sort of super notice would be required. The notice received by plaintiffs was sufficient.
Plaintiffs further contend that the informal process of the Commission, without a full adjudicative hearing, failed to satisfy the due process requirement of an opportunity to be heard. There is no specific requirement to be applied in any case in which a party is entitled to procedural due process. “Due process is flexible and calls for such procedural protections as the particular situation demands.” (Niagara Falls Mem. Med. Ctr. v Axelrod, 88 AD2d 777, 777 [4th Dept 1982], citing Morrissey v Brewer, 408 US 471, 481 [1972].) Procedural due process does not necessarily require a trial-type hearing. (RR Vil. Assn., Inc. v Denver Sewer Corp., 826 F2d 1197, 1204 [2d Cir 1987].) Given the nature of the tasks assigned to the Commission, a full hearing for the benefit of every hospital would have created too great a burden for them to fulfill their legislative mandate. For this particular adjudicative function, something less than a trial-type hearing would suffice. In fact, the procedure specified under Public Health Law § 2806 (6) does not include a trial-type hearing. That section only provides for the public to send comments and for the facility to request a public hearing (although no requirement on the Commissioner to grant the request). While a more formal hearing process might have been advisable before affecting a hospital’s operating license, it was not constitutionally required.
This court is concerned, however, about whether the Commission’s recommendations, now a directive to the Commissioner, are subject to judicial review. Plaintiffs have not brought a CPLR article 78 proceeding against the Commissioner to review the Commission’s recommendations,[3] and no determination in this action of the success of such an article 78 proceeding is proper here. The Enabling Act does not provide for any judicial review, and in a proceeding brought in Chemung county prior to December 31, 2006, seeking article 78 relief against the Commission, the court denied such relief, finding that the petitioners therein were not aggrieved since the Commission’s recommendations did not yet have the force of law. (In re St. Joseph’s Hosp. v Commission on Health Care Facilities in Twenty-First Century, Sup Ct, Chemung County, Jan. 4, 2007.)
*345 Legislation may explicitly provide for no judicial review. Where there is no explicit preclusion of judicial review, the court will examine legislative intent. While there is dicta in one Court of Appeals case that the absence of review of a final agency determination might raise a serious constitutional question,[4] rather than striking the statute which has precluded the judicial review, the courts have engrafted a limited review of the determination to the statute. In Matter of New York City Dept. of Envtl. Protection v New York City Civ. Serv. Commn. (78 NY2d 318 [1991]), the Court provided judicial review in an article 78 proceeding despite a clear and unambiguous intent by the Legislature to preclude judicial review. Noting that judicial review constitutionally cannot be precluded completely, the Court applied a limited standard of review of the agency determination, i.e., whether the agency action was “purely arbitrary.” Thus, while the absence of any judicial review in the Enabling Act is disturbing, such absence does not require the striking of the Enabling Act under the Due Process clauses of the United States and New York constitutions. For all of these reasons, plaintiffs’ third, fourth, and fifth causes of action are dismissed.
IV Plaintiffs’ Claims under the Establishment Clause and Free Exercise Clause of the United States and New York Constitutions
Plaintiffs have withdrawn their claims under the Establishment Clause of the United States and New York constitutions which were set forth in the eleventh and twelfth causes of action. Their claims under the Free Exercise Clause are predicated on two issues. First, plaintiff CHS claims unequal treatment by the Commission regarding the amount of time that CHS met with the Commission as compared to the amount of time that Kaleida Health, a nonreligious hospital system, was given with the Commission. The second claim is that closing plaintiff St. Joseph Hospital deprives it of practicing its religious ministry.
With respect to the first claim, nothing in the Enabling Act requires the Commission to meet with any hospital or health *346 care system. Even if the plaintiffs’ claim that Kaleida was given more time was undisputed, that would not be a result mandated by the Enabling Act, which is, as plaintiffs concede, a neutral statute which does not refer to religion anywhere within it. This is not an article 78 proceeding seeking to review the actions of the Commission.
With respect to the issue of the closing of plaintiff hospital, it is clear that Employment Div., Dept. of Human Resources of Ore. v Smith (494 US 872 [1990]) bars the claim under the Free Exercise Clause of the United States Constitution. In that case, the United States Supreme Court found that a statute enacted under the state’s police power which incidentally prevented certain religious practices was not violative of the individual’s free exercise rights. The Enabling Act in this case, enacted under the State’s police power, empowers the Commission to make recommendations without regard to any religious affiliation or practices. Under the Enabling Act, all hospitals, whether religiously affiliated or not, were subject to the Commission’s examination. Nothing in the Enabling Act violates the Free Exercise Clause of the First Amendment to the United States Constitution.
Determination of claims under the Free Exercise Clause of the New York Constitution require a balancing between the incidental burdens on the religious practices and the interest advanced by the legislation. (Catholic Charities of Diocese of Albany v Serio, 7 NY3d 510 [2006].) The Court of Appeals has found that the New York Constitution does not impose the strict test imposed for the Free Exercise Clause in the First Amendment to the United States Constitution by the United States Supreme Court in Smith, but has also rejected any “strict scrutiny” or “compelling interest” test. Instead, considerable deference is given to the Legislature and the party challenging the legislation bears a heavy burden of demonstrating an unreasonable interference with that party’s religious exercise. Plaintiffs have not met this burden. First, CHS has other area hospitals which were not adversely affected by the Commission’s report. Second, plaintiffs have offered no indication of how the closing of this particular hospital deprives the plaintiffs of the ability to perform any religious practice. In Catholic Charities, the effect upon the plaintiffs’ religious practices was greater than here, but the Court found that because the law in question did not require the plaintiffs to engage in a practice that violated their religious tenets, they had not met their *347 burden. The free exercise claims must fail. For these reasons, plaintiffs’ eighth, ninth, tenth, eleventh and twelfth causes of action are dismissed.
Y. Plaintiffs’ Claims Under the Contract Clause of the United States Constitution
Plaintiffs claim that the Enabling Act impairs their contractual relationship with suppliers, vendors and employees which will extend beyond June 2007 which is the scheduled closing of the plaintiff hospital. Defendants claim that the plaintiffs lack standing to assert this claim, that the claim is not ripe and also that the legislation is within the proper exercise of the State’s police power and does not violate the Contract Clause.
Plaintiffs have demonstrated that their contract rights are impaired by the required closing of plaintiff hospital. Plaintiff CHS has an ongoing relationship with many of the contractees regarding other CHS facilities. These are affected by the impending closing of the plaintiff hospital. The effect on plaintiffs is substantial and immediate. Thus, they do have standing to assert this claim, and the claim is ripe.
In examining the merits of the claim under the Contract Clause, plaintiffs have a heavy burden. They must demonstrate that the impairment is substantial, and that the legislation either was not in furtherance of a legitimate interest or that the impairment of the contracts could be reasonably avoided. (Sanitation & Recycling Indus., Inc. v City of New York, 107 F3d 985 [2d Cir 1997].) They do not meet that burden. The effect on their contract rights are necessary to effect the purpose of the Enabling Act. The legislative findings contained in section 1 of the Enabling Act make clear that a wholesale review of the provision of health care services was necessary. As a result, some facilities would be closed, and their operating certificates revoked. As a consequence, contract rights of any such facility would be affected. There was simply no way for the Commission to do its job without recommending actions which would affect contract rights. The Enabling Act was both in furtherance of a legitimate interest, and given the phase in of the recommendations, reasonable in the level of impairment upon the contract rights. In fact, the Enabling Act created no greater impingement on contract rights than Public Health Law § 2806 (6) does. For these reasons, plaintiffs’ fourteenth and fifteenth causes of action are dismissed.
*348 VI. Plaintiffs’ Other Claims
Under the plaintiffs’ thirteenth cause of action, plaintiffs claim that the Enabling Act violates the State Administrative Procedure Act. There is no question that specific legislation may alter provisions of existing general law, unless the existing law is constitutionally mandated. (Pataki v New York State Assembly, 4 NY3d 75 [2004].) For this reason, plaintiffs’ thirteenth cause of action is dismissed.
In the sixteenth cause of action, plaintiffs claim a violation of separation of powers by defendant George Pataki, in that he “locked-in” the Commission’s findings in furtherance of receipt of federal funds, before the Commission had issued its report or the Legislature had acted. While the plaintiffs might claim that a press release or briefing might indicate the Governor’s agreement in derogation of the Legislature’s prerogative, no such contract by the Governor has been offered. Nor has there been any indication that the Legislature could not have exercised the legislative veto in section 10 of the Enabling Act.[5] As long as the Legislature was free to reject the federal funding, even if unattractive, there has been no impingement on the separation of power by any actions by the federal government or the Governor. (South Dakota v Dole, 483 US 203 [1987].) For this reason, plaintiffs’ sixteenth cause of action is dismissed.
Finally, in the third, sixth, ninth, twelfth and fifteenth causes of action, plaintiffs seek relief under 42 USC § 1983, and counsel fees under 42 USC § 1988. Section 1983 does not create a new cause of action. It simply provides the vehicle by which a plaintiff can seek monetary damages or an injunction against a person acting under color of state law in violation of the plaintiffs’ rights under the United States Constitution. (Chapman v Houston Welfare Rights Organization, 441 US 600 [1979].) In each of the causes of action pursuant to section 1983, plaintiffs claim that the Enabling Act is unconstitutional. No other claims under section 1983 are made in the ad damnum clauses of the complaint. Since the constitutional claims to the Enabling Act are dismissed, all section 1983 claims must also fail. For this reason, each of the causes of action under section 1983 is considered and dismissed, along with the direct *349 constitutional causes of action in each category enumerated in parts II through V of this memorandum decision.
For the foregoing reasons, the plaintiffs’ motion for summary judgment is denied; the defendants’ motion for summary judgment is granted and the complaint is in all réspeets dismissed.

. Section 31 of part E of chapter 63 of the Laws of 2005 created a new part K to the laws amending the Public Health Law. Section 1 of that part K included the legislative findings quoted here. All other section numbers refer to sections of part K.

. The 1978 amendments were designed to protect patients and did not affect any of the provisions of section 2806 which are examined here.

. Presumably, an article 78 proceeding against the Commission would not lie in that the Commission was terminated under section 11 of the Enabling Act as of December 31, 2006.

. Long Is. Coll. Hosp. v Catherwood, 23 NY2d 20, 36 n 3 (1968) (“In point of fact, in the absence of some procedure for the review of a final agency action, a serious constitutional question might arise, for, as was recently observed, ‘there must be some type of effective judicial review of final, substantive agency action which seriously affects personal or property rights’ ”), quoting Gardner v Toilet Goods Assn., Inc., 387 US 167, 177 (1967).

. It is also ironic that the legislative function that plaintiffs assert the Governor has usurped is the very legislative veto that the plaintiffs have urged is unconstitutional, and this court has severed from the rest of the legislation.